B. F. BROWN, APPELLANT, v. L. FLEISCHNER, STATE TREASURER, RESPONDENT.

AUTHORITY OF THE SECRETARY OF STATE IN AUDITING CLAIMS AND DRAWING WARRANTS.—The authority of the Secretary of State to audit accounts and draw warrants upon the Treasurer, depends upon the condition that an appropriation has been made by the Legislature for their payment.

STATE TREASURER—WHAT WARRANTS MAY BE PAID BY.—The State Treasurer is presumed to know what appropriations have been made, and he has no right to pay warrants unless drawn upon some specified fund, except when a claim is authorized by law to be paid out of a general contingent appropriation, he may pay the same upon the warrant of the Secretary.

*Per Upton, J., dissenting:*

LEGISLATIVE POWER, DELEGATION OF.—The Legislature cannot delegate the power to legislate, unless it be in the specified exceptional case of creating municipal corporations.

STATUTE, AMENDMENT OF—APPROPRIATION ACT.—Provisions in a General Appropriation Act cannot operate to transfer the power of auditing claims from one officer to another. Nor can the statute that provides the mode of auditing public accounts be revised and amended by a joint resolution, or by provisos in a General Appropriation Act.

FUND.—Every law that imposes or authorizes a tax must create a fund, unless a fund already exists, into which the tax is to be paid.

IDEM.—When a statute provides that the State shall pay for particular services, if there is no special requirement that the claim shall be paid out of a particular or special fund, it will be payable out of the general fund.

AUDITING PUBLIC ACCOUNTS.—The provisions of § 6, p. 622, of the Compiled Laws, requiring the Secretary of State "to examine and determine the claims of all persons against the State, in cases where provisions for the payment thereof shall have been made by law," limits the action of the Secretary to *cases* where the law provides or enacts that the claimant is entitled to be paid by the State, and not to *times* when payment can be instantly made.

DUTY OF THE SECRETARY OF STATE.—It is the duty of the Secretary of State to audit public accounts in every case where the law has clearly provided that the claimant shall be paid by the State; and if the claim is allowed, to draw his warrant for the amount found due.

APPEAL from Marion County.

In §§ 5, 7, 8, 10 and 12 of the General Appropriation Bill passed by the Legislature in 1870, provisions were made for the redemption of warrants drawn on the penitentiary, incidental, executive and general funds, with a proviso in each case that said warrants should not be paid until after the same had been audited by an investigating commission, *provided* such commission was appointed. At the same session the Legislature adopted a joint resolution creating such a commission.

Appellant petitioned for a mandamus to compel the payment of certain warrants drawn by the Secretary of State on the penitentiary and incidental fund for the payment of claims which had been disallowed by the investigating commission. These warrants had been drawn prior to the Act of 1870, to cover expenditures which the Legislature of 1868, failing to pass an appropriation bill, had not provided for.

The other facts are stated in the opinion of the Court.

*Knight & Lord*, for Appellant.

The provisos contained in §§ 5, 7, 8, 10 and 12 of the Act of 1870, are unconstitutional and void. In contemplation of law no such investigating commission as is referred to in those sections has been created. The Constitution has made the Secretary of State auditor by virtue of his office (Constitution, Art. 6, § 2), and in pursuance thereof the Legislature has defined his duties. (Mis. Laws, ch. 1, §§ 15–20.) The Legislature has no power to delegate any duty or authority which the Constitution has imposed on the Secretary of State, to any other officer, board, commission or tribunal. (10 Wisc. R. 525.)

The joint resolution creating the investigating commission creates an office. (2 Bouv. Law Dict. 239; 8 Cal. 41.) The Legislature has no power to enact a law the taking effect of which is made to depend on any condition or other authority not provided in the Constitution. (Constitution, Art. 1, § 21; 4 Selden, 483; 2 Iowa, 205.) Laws making

appropriations for the salaries of public officers and other current expenses of the State, shall not contain provisions on any other subject. (Constitution, Art. 9, § 7.) Every act must embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title. But only so much of any act shall be void as relates to subjects not embraced in the title. (Constitution, Art. 5, § 20; 14 Louis. R. 9; 32 Ill. R. 181; 11 Ind. R. 199; 4 Metcalf (Ky.) R. 72.) If the void part of a statute can be stricken out and the valid portion will be operative, the former should be rejected and the latter allowed to stand. (1 Gray, 21; 5 Gray, 100; 4 Metcalf, 288; 24 Pick. 361; 3 Nevada, 180.) It is the imperative duty of the Secretary of State to draw his warrant when claims of the character embraced in the warrants in question are presented duly credited and certified. (Mis. Laws, ch. 44, § 14; Id. ch. 1, §§ 15, 21.) The Treasurer has no power to audit and settle claims against the State and cannot refuse to pay a warrant drawn on him, in legal form, if there are funds in the Treasury appropriated by law for the purposes specified in the warrant. (Mis. Laws, ch. 1, § 28; 2 Metcalf (Ky.) R. 106; 14 Louis. R. 225.)

*G. W. Lawson* and *C. G. Curl,* for Respondent.

The State Treasurer cannot pay without an appropriation first made by the Legislature, and the Legislature may appropriate or not in its discretion. (Constitution, Art. 9, §§ 2, 4, 7; 1 Ogn. 213.)

The Secretary of State has no right to audit claims against the State, except in cases where provision for their payment has been made by law. (Mis. Laws, ch. 1, § 15.) The warrants in question were drawn prior to the Act of 1870, and before any attempt had been made to appropriate money for their payment. They were therefore void.

By the Court, THAYER, J.:

This was a proceeding by petition for a writ of mandamus against the State Treasurer, L. Fleischner, to compel the payment of five certain State warrants, drawn in 1869 and

1870 by Samuel E. May, late Secretary of State, upon said Treasurer, who refused payment thereof.

The application for the writ was argued at Chambers before the Judge of the Third Judicial District, Hon. R. P. Boise, and the writ dismissed, from which order the petitioner appeals to this Court.

Many points were discussed in the argument of this case, by the counsel for both parties, which this Court does not deem it necessary to decide.

It seems from the proceedings herein, that the Legislature which convened in 1868, failed to make appropriations to defray the expenses of the State for the ensuing two years, as required by law.

The only question which this Court has considered it necessary to determine is, whether the State Treasurer was bound to pay warrants drawn upon him by the Secretary of State, when no appropriations have been made by the Legislature for their payment.

Section 2, of Article IX, of the Constitution of this State reads as follows: ''The Legislative Assembly shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the interest on the State debt, if there be any.'' Section 4, same Article, provides, that ''no money shall be drawn from the Treasury, but in pursuance of appropriations made by law.'' Section 7, ditto, provides, ''that laws making appropriations for the salaries of public officers and other current expenses of the State, shall contain provisions upon no other subject.'' The statute, page 621, § 15, subdivision 7 (Mis. Laws, ch. 1, § 15), provides, that among other duties of the Treasurer, ''he shall examine and determine the claims of all persons against the State, in cases *where provisions for the payment thereof shall have been made by law,* and to indorse upon the same the amount due and allowed thereon, and from what fund the same is to be paid, and draw a warrant upon the Treasury for the same,'' etc.

The Secretary of State, like every other officer of the State government, possesses no substantive powers, except

such as are enumerated in the Constitution and statute. The provisions of law referred to define and limit his duties, and he can only exercise those duties upon the terms and conditions specified in those provisions. His authority to audit accounts and draw warrants upon the Treasurer, depends upon the condition that an appropriation has been made by the Legislative Assembly for their payment.

The State Treasurer, like the Secretary, has only limited duties and functions, which he has no right to transcend. He is presumed to know what appropriations have been made by the Legislature, and has no right to pay warrants, unless drawn upon some specified fund, except when a claim or amount is authorized by law to be paid out of a general contingent appropriation, which he may pay upon warrant of the Secretary. (Mis. Laws, ch. 1, § 28.)

These guards and checks upon transactions of public officers were wisely made, and each officer should be required to keep within the scope of his authority, not only in order to secure the interest of the public, but also to protect the rights of the individual citizen. As there were no appropriations made for the payment of the warrants in question, the Secretary of State had no right to draw the same, and the State Treasurer violated no official duty in refusing to pay them.

. The decision of the Court below is, therefore, affirmed.

UPTON, J., dissenting:

This case involves the question whether the Secretary of State has authority to audit public accounts at times when all the money which may have been appropriated to the payment of the particular class of accounts that may be presented, has been paid out upon claims of the same class. Some incidental questions of minor importance arise in the case, and it will avoid complication to refer to them before entering upon the principal and very important question relative to the duties of the Secretary of State. The incidental questions relate to the powers and duties of a commission or legislative committee, appointed in pursuance of a joint resolution passed October 25, 1870.

The Constitution uses the following language in regard to the Secretary of State (§ 2, Art. 6): "He shall be, by virtue of his office, auditor of public accounts, and shall perform such other duties as shall be assigned him by law." By the act of 1859 (Mis. Laws, ch. 1, § 15), it is made his duty "to examine and determine all claims of all persons against the State in cases where provision for the payment thereof shall have been made by law, and to indorse upon the same the amount due and allowed thereon and from what fund the same is to be paid, and draw a warrant upon the treasury for the same."

There are some provisions of statute that appear at first glance to be an attempt to transfer the power to audit public accounts from the Secretary of State; as, for instance, that which directs the Superintendent of the Penitentiary to certify to certain accounts; but in reality they amount only to this: that the certificate shall be sufficient evidence to authorize the Secretary to approve the account and draw his warrant. I think these provisions have never been treated as having greater force, and up to the passage of the joint resolution above mentioned, I am not aware that any question has been raised against the power of the Secretary of State to act as auditor of public accounts.

Prior to the session of the Legislature of 1870, the Secretary of State had audited claims and drawn warrants which were unpaid at the time of the passage of the joint resolution in question, among which were the warrants in controversy; and it has been assumed in the course of the argument that the commission appointed in pursuance of the joint resolution was clothed with power to review the action of the Secretary of State, and to annul or approve the warrants previously drawn by that officer; and the power has been claimed for the commission, to annul such part of each warrant as their discretion should dictate. Whether the Legislature could confer such power on a commission or committee thus appointed, is one point discussed; another point is, whether the language of the joint resolution imports an intent to confer such power.

The joint resolution directs "that a committee com-

posed of two persons, one to be chosen by each House, be constituted a commission. Said commission shall have power to select an additional commissioner, who shall be governed by the same rules and receive the same compensation as the other commissioners." The compensation is fixed at five dollars per day. This commission is directed to inquire into various specified matters. Their duties, so far as they relate to any subject connected with the warrants in question, are declared in the following language: "It shall be the duty of said commission, after it is organized, to proceed at once to investigate the official conduct of the State officers for the last four years in the following order: First, Superintendent of the Penitentiary; second, Treasurer; third, Secretary of State; fourth, Governor; and fifth, Commissioners of School Lands; to examine the books of each department, compare all entries therein with the vouchers on file; to examine all original bills by items, comparing them with the vouchers, and attest the same to the Treasurer, if correct, and the Treasurer is required to pay the warrants so certified upon presentation."

That part of the resolution that treats of the general powers of the committee provides, that "said commission shall have power to appoint a competent clerk to issue subpœnas, administer oaths, compel the attendance of witnesses and to send for persons and papers. They shall keep a correct record of the testimony taken before them and report the same, properly attested, at the next session of the Legislative Assembly."

The leading object here contemplated is evidently a committee or commission to investigate facts and report for the information of the Legislature; and I am unable to find, in the language employed, authority in the Commission, either to assume the duties of the Secretary of State in auditing accounts, or to render final decisions as a tribunal to review his action.

It may be a reasonable inference from the language of the resolution, that it was then expected some Act would be passed prohibiting the Treasurer from paying the warrants then outstanding, and perhaps amending the statutes that

relate to the duties of the Secretary of State and of the State Treasurer. But nothing in the resolution purports to amend those statutes or to prohibit the Treasurer from paying warrants; nor does it require holders of warrants to surrender or present them. If *bills* were found *correct* the committee was directed to *attest* them; but as to bills that they should consider incorrect or doubtful, or correct in part and incorrect in part, they have no authority to attest or certify or take any action except to report their proceedings with the evidence to the Legislature. I infer from this language that the object of causing bills which the Commission deemed correct to be "attested," was to indicate those in regard to which there was in their opinion no necessity of reporting to the Legislature and no necessity for legislative action.

If the matter could be divested of all question as to the power of amending laws or making laws by joint resolution, and of all question as to the constitutionality of what is contended for, the language of the resolution, of itself, is not sufficient to direct the Commission to undertake to make a final decision in regard to bills that they do not deem correct, or to do more in regard to them than to investigate and report. This view corresponds with the whole tenor of the resolution, the general object of which is an investigation and information to be laid before the Legislature. If we add to this the consideration that the Legislature must be presumed to know that the statutes prescribing the duties of the Secretary and Treasurer were still in force, and that they could not be 'amended by a joint resolution, the conclusion is irresistible that the Legislature never contemplated conferring power to make final decisions by the joint resolution alone.

These are not the only difficulties in the way of claiming such power for the Commission. An attempt to show that this was something more than a legislative committee of investigation, and to show that, in addition to its duty to investigate and report for the information of the Legislature, it had power to make final decisions, whether in the capacity of public auditors or as a judicial board for review-

ing the decisions of the Secretary of State, or as a representative of the Legislature to determine these matters by virtue of delegated legislative power, will meet with very serious obstacles. The following are some of the difficulties that stand in the way of the assumption:

The Legislature cannot delegate the power to legislate unless it be in the specified exceptional case of creating municipal corporations. It is a maxim of the law that a delegate cannot delegate his powers.

By § 30, Art. IV of the Constitution, no Senator or Representative shall be appointed to any civil office of profit that shall have been created during his term.

Such a Board, in making final decisions, must act within one of the four governmental departments: the legislative, executive, administrative or judicial; "and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided." (Section 1, Art. 3.)

The Constitution vests the power of auditing public accounts in the Secretary of State.

Section 1, Art. VII, of the Constitution, vests the judicial power of the State in the particular tribunals there specified, and such a commission cannot be clothed with judicial power.

The mode of auditing accounts was already prescribed by statute, and it could not be changed, except by amending or repealing the law. Laws cannot be amended by joint resolution, but the act or section amended must be set forth at length.

Whether the power of such Commission to decide the matter in question be claimed as exercised within the legislative, the administrative or the judicial department of the government, the difficulty is equally great. If it is conceded that the Legislature may, as a legislative act, pass upon all claims against the State, it is certain that a legislative act requires a quorum of each House, and the power to act in a legislative capacity cannot be thus delegated. If the Commissioners are appointed not to legislate, but merely to audit claims, their acts would be within the administra-

tive department; their function would be one which the Constitution has vested in the Secretary of State, and they, while members of the Legislature, would be holding an office of profit created by the Legislature of which two of them are members. If their action is a mere review of the decisions of the Secretary of State with power to affirm or reverse, they must either act by virtue of delegated legislative authority, or their action is an attempted exercise of a part of the judicial power of the State.

It is plausibly said the Legislature has power to appoint committees of inquiry to act during the recess, or while the Legislature is not in session, and hence had a right to appoint this Commission, and that the Commissioners were still members of the Legislature, and consequently not appointed to any office of profit created by the same Legislature of which two of them were members; that the Commission was authorized to perform certain duties which it was not convenient for the Legislature to perform in session, and that "this kind of legislation is not new."

The sophistry of this statement lies in the circumstance that it ignores the main point claimed by its author, and the main point which it seeks to establish; it ignores the question whether the Commission has power to make decisions that shall be *final* without being reported to and acted upon by the Legislature. With this point added, it cannot be said that this kind of legislation is not new. It is claimed in the same connection and as part of the same argument, that this Commission exercises "powers that are in their nature judicial," and that their decision concerning the warrants is "a final judgment so far as any provision now exists for their redemption." The bare statement of this position is sufficient to show that the power claimed for the Commission is something more than can pertain to a mere legislative Committee, and that, if such be their powers, they are officers filling an office created by the Legislature of which two of them are members.

The position that the Commissioners had power to make final decisions and yet held no office other than that of members of the Legislature, and the statement made in the same

argument, that the constitutional limit of pay to members of the Legislature only applies during the time of the session, and that at other times members may receive five dollars per day, seem to rest on very similar bases; but I have not been able to appreciate the strength of either position, and I must proceed upon the conviction that if the Commissioners were thus empowered they held an office other than that of members of the Legislature.

To the point touching the ability of members to fill the office, if it be an office of profit, it is replied on the part of the respondent that even a constitutional disqualification of members will not render the acts of the Commission void, and that the point is therefore immaterial.

Whether or not the acts of the Commission would be void in the case supposed, the fact that members of the Legislature were appointed by the authors of the resolution is a material and a very strong circumstance against the inference that the framers of the resolution intended to charge the Commission with duties which members of the Legislature were prohibited from performing; and such considerations are especially applicable to a case like this, where the power to audit claims or make final decisions is not conferred by express words, but sought to be raised by implication. In construing the resolution, we have no right to assume that its authors were ignorant of the law, or that they intended to violate the Constitution.

It cannot be supposed that the Legislature intended, by the indefinite language employed in this resolution, to direct the Commission to take all the bills from their proper custodian and pass them over to the custody of the State Treasurer, thus destroying the system of checks and balances and the means of verifying the accounts between the Secretary and Treasurer. Yet the only certificate they were empowered to make is an attestation of the bills deemed correct; and the power to make that attestation is the only power the resolution purports to confer upon them, even by implication, except the power to investigate and report to the Legislature. The Committee was not empowered to draw warrants or in any manner to give the Treasurer· official

notice or information in regard to bills that were deemed incorrect or doubtful.

It is also indicated in provisos contained in the Appropriation Act, passed three days later than the resolution, that the Legislature did not consider the duties of the Treasurer modified or changed by the joint resolution; but the resolution derives no force or vitality from the provisos contained in the Appropriation Act, because the Constitution, Article IX, Section 7, provides that " laws making appropriations for the salaries of the public officers, and other current expenses of the State, shall contain provisions on no other subject." It cannot reasonably be contended, in the face of that direct and unequivocal provision, that the General Appropriation Act can operate to transfer the power of auditing claims from one officer to another; or that it can contain valid provisions in regard to what persons shall act as "auditor of public accounts," when that matter is already settled by the Constitution.

Section 10 of the Appropriation Act, just mentioned, is as follows: "For the redemption of warrants drawn on the General Fund, $8500; *provided,* that nothing in this section shall be so construed as to apply to the payment of said warrants until the same have been audited by the investigating commission; *provided* said commission is appointed." And the other sections, making appropriations, are accompanied by similar provisos. It is conceded, in this case, that the Appropriation Act has taken effect, the point controverted in relation to it being whether the provisos are operative, or whether they are surplusage. And I think it may be taken, as conceded in the argument, that unless the commission had power to decide upon the validity of these warrants, the appropriation covers them. At least that is the law, if the Act has become operative. It needs no argument to show that the statute that prescribes the mode of auditing public accounts cannot be revised and amended by a joint resolution, or by provisos in a General Appropriation Act. The statutes defining the duties of the Secretary of State, and of the Treasurer, have not been amended in any manner known to the Constitution. The

effect and authority of the warrants remained the same after the passage of the joint resolution as before, and the duties of the Treasurer remained the same.

In my opinion the commission had no power to make a final decision upon the claims in question, and the case must turn wholly upon the point whether the Secretary of State had power to audit the accounts at the time the warrants were drawn. The decision of this point depends upon the construction of the provision of statute first above quoted. It is contended on behalf of the respondent that the words of that section which limit the action of the Secretary of State to "cases where provisions for the payment thereof shall have been made by law," should be construed to limit the Secretary's action to *times* when there are unexpended appropriations; or, in other words, that the language employed indicates an intention to limit the times when, or the circumstances under which, he may proceed, rather than the *cases* in which he shall audit public accounts.

In discussing this question, much stress is laid on the provision of the same section which requires the Secretary to indorse on the claim, "from what fund the same is to be paid." It is assumed that when the money specified in an appropriation act is exhausted *a fund is annihilated;* and from this assumption it is argued that from the time of exhausting the appropriated money "it was impossible for him [the Secretary] to indorse on a claim the fund out of which it was to be paid," it being claimed that, " when the appropriation was exhausted, no such fund existed, and the only way in which a fund can be created is by an appropriation by the Legislature." The argument .is founded upon an evident inadvertency in applying or defining the words "fund" and "appropriation," by which the words are treated as convertible terms or their signification is confounded. The whole of this branch of the argument is based on the erroneous assumption that a fund can be created only by an appropriation act.

The Constitution and our statutes relating to finance, use the word "fund" in its ordinary acceptation, and a brief examination will show that the word is employed to denote

something other than an appropriation, and that every law that imposes or authorizes a tax must create a fund, unless a fund already exists, into which the tax is to be paid. Funds are frequently created by law for particular purposes, such as the payment of interest on loans, or for the payment of a particular class of expenses; and a fund may be thus created in advance of the time when any of the money is appropriated by an appropriation act. Sec. 2, of Art. VIII of the Constitution, created a fund called the Common School Fund. By § 58 Mis. Laws, ch. 57, the Legislature created a fund consisting of five mills annually on the dollar, of the taxable property in the State, which is usually denominated "The General Fund." But by the Act creating this fund, the Legislature did not make an appropriation; it simply created a fund to meet the current expenses of the State, and provided a mode of collecting the money into the State treasury. These details of mode could not have been provided by an appropriation act, for those Acts can contain provisions on no other subject but that of the appropriation.

The Legislature from time to time creates special or particular funds, but after they are created the Treasurer cannot lawfully pay out any money from a special fund, nor can he pay out money from the general fund, until an Act is passed appropriating the money.

The difference in the meaning of the two words "fund" and "appropriation" is broad and distinct, both in their ordinary acceptation and in the manner in which they are employed in the Constitution and statutes of the State. And unquestionably a fund may exist before any of the money pertaining to it is appropriated and after an appropriation is exhausted.

By Art. IX, § 3, of the Constitution, "Every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." Every such law creates a fund or raises money for a fund already created.

Section 111 (Mis. Laws, ch. 57) provides that "whenever any moneys shall have been collected or received by any officer for any distinct and specified object, no portion of

them shall be paid or applied to any other object or purpose without due authority, but it shall be kept *a separate fund* for such specific object."

From these, and similar enactments, it is clear that a fund must exist in every case where a tax is levied, and every collector and custodian of public money is presumed to know that such is the law, and is liable to criminal prosecution if he diverts any money from the fund to which it belongs, or fails to keep it in that fund.

In many cases, statutes that provide for paying for services are silent as to the fund out of which the claim is to be paid. When a statute provides that the State shall pay an officer or other person for particular services, or on account of property sold to the State, if there is no special requirement that the claim shall be paid out of a particular or special fund, it will be, I think, as a matter of course, payable out of the general fund created to defray the current expenses of the State. Section 28 of the same chapter that defines the duties of the Treasurer of State (Mis. Laws, ch. 1), provides that when any claim is " required to be paid out of a particular fund, it shall be paid out of such fund only." This is a very plain indication that a claim which is not required to be paid out of a particular fund is to be paid out of the general fund only.

The distinction between a fund and an appropriation has always been observed by prior Legislatures, and was not disregarded by the Legislature that passed the joint resolution in question. The statutes passed by the last Legislature recognize the existence of a general fund and of special funds in the absence of any appropriation. In treating of warrants drawn when there was no unexpended appropriation in existence, they appropriate money for warrants drawn on the general fund, on the penitentiary fund and on several other funds. They also appropriate money " *out of* the general fund " for certain purposes. No appropriation act was ever passed appropriating money *into* the general fund; and if the terms "fund" and "appropriation" are synonymous, or if the only way in which a fund can be created is by an appropriation, there has never been any

money belonging to the general fund.   It would be absurd to attempt to appropriate money *out of* the general fund if that fund is not created otherwise than by an appropriation act.

Unquestionably the existence of a fund does not depend upon whether or not the money pertaining to the fund has or has not been appropriated, and every lawful claim is either payable out of some particular fund or out of the general fund.   When the law provides that a claim shall be paid and the claim is presented to the Secretary to be audited, it becomes the duty of the Secretary, if the claim is allowed, to determine out of what fund it is to be paid. If the law requires it to be paid out of a particular fund, he should indorse it accordingly, and if the law requires it to be paid, but does not require it to be paid out of a particular fund, it is to be paid out of the general fund, and it should be so indorsed.

The provision about indorsing warrants need not be further considered in construing the words, "in case where provisions for the payment thereof shall have been made by law."   I think the most natural and obvious import of the words just quoted, is what the Legislature intended by this enactment; and that these words import an intention to confine the action of the Secretary to *cases* where payment has been sanctioned by law.   I think the word "provisions" is here used, as it is generally used when speaking of legislation in the sense of "enactments;" and that the intent was to confine the Secretary to *cases* where the law provides or enacts that the claimant is entitled to be paid by the State and not to *times* when payment can be instantly made.

It is said this doctrine would invest the Secretary with legislative " power to control the disbursements of the public funds and pledge the public credit."` The auditing of a public account neither controls the disbursement or pledges the credit or faith of the State.   An account cannot be paid simply because it is audited, and the Secretary cannot audit an account unless the credit of the State is already pledged by some provision of law previously made, pledging the

faith of the State that the claimant shall be paid. The Secretary's function is to decide whether the faith of the State has been so pledged by previous legislation, and if it has been pledged, to ascertain and certify to what extent. The claim certified by him is not to be paid solely because of his certificate or warrant, nor until the Legislature shall, in addition to such previous pledge, pass an act of appropriation in fulfillment of the pledge. If the Secretary commits a fraud or exceeds his jurisdiction, his action is as open to investigation before the judicial tribunals of the State as are those of a minor officer. He pledges nothing; he simply decides matters within his jurisdiction. It is the Constitution and the law-making power that pledges the faith of the State.

By § 6, Art. IX, of the Constitution, "Whenever the expenses of any fiscal year shall exceed the income, the Legislative Assembly shall provide for levying a tax for the ensuing fiscal year sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of the ensuing fiscal year."

From this carefully chosen language, we see that for the ensuing year an *estimate* may be relied upon; but the deficiency is to be *ascertained* and not merely estimated. The provision must be *sufficient* to pay the *deficiency* of the past in addition to the amount *estimated* for the future. Using the word "estimated" in the one case and omitting it in the other precludes any supposition that the levy is to meet only a mere estimated deficiency or an amount supposed to be sufficient to meet the deficiency. The Legislative Assembly is required to provide for levying a tax that is sufficient for the actual and not the estimated deficiency; and to do this it is evidently intended that they will know the amount of the deficiency. How is the amount to be known if he who alone is auditor of public accounts and who is made such by the Constitution, is prohibited from auditing?

This section of the Constitution answers a point raised by the defendant's counsel, that until the money is to be drawn from the Treasury there is no necessity of auditing claims. Drawing a warrant is incident to the auditing and

is made so by statute. The manner in which the auditor enters or records his decisions is by indorsing the decision on the claim, and if the decision is favorable he does what is denominated "drawing" a warrant; but drawing a warrant is not a necessary part of the auditing except as it is made so by statute, and the decision would be just as effective if recorded in some other way. Drawing a warrant is not drawing money out of the Treasury, nor does it entitle the holder to receive money out of the Treasury, unless all the other requisites of the law concur with this act. The money must be collected and payment must be preceded by an act of appropriation. Drawing a warrant is part of the formal and convenient mode provided by statute for recording the auditor's decision, but the decision would be as effectual if the Legislature had provided some other mode of entering the decision. The substance of the transaction which, it is claimed, is prohibited, is the auditing of the accounts. If the Secretary is utterly prohibited from passing upon claims, it is difficult to know how the expenses could ever exceed the income or how a deficiency could ever arise. But even if we consider claims that are not even entitled to be audited to be "expenses," from which a deficiency may arise, it is certain that a rule that would prohibit the auditor of public accounts from acting upon such claims, would deprive the Legislature of the only mode known to the Constitution of ascertaining a deficiency.

I think too much importance is attached to the use of the word "provisions" in this connection. An attempt is made to construe the sentence as if that word pointed particularly to obtaining or appropriating money. The words "provision" and "provided" are employed frequently in speaking of statutory enactments of every kind, and on every subject, and the phrase "provisions made by law," when used to denote a statutory enactment, is no more subject to such limited meaning than the word "enactment," or any of the phrases used to denote the passage of a statute authorizing, permitting, directing, or requiring some particular thing to be done. It is not an unusual mode of expression to say, "provisions are made by law" for the

times of holding Courts, for compelling the attendance of witnesses, for taxing costs, for changing the place of trial, for paying jurors, for the payment and satisfaction of judgment, when the collection, appropriation, obtaining or providing money is not alluded to by the statute or by the speaker, and when the only allusion to the subject of money is a provision as to the amount payable or the party entitled.

Another reason why the word "provisions" as used in this section ought not to be construed to point to the appropriation of money is, that the State is as well provided with money before the passage of the Appropriation Act as after. Such Act does not place a dollar in the treasury; it is merely the Treasurer's letter of authority for paying out money which is provided or obtained by virtue of some other law.

Section 28 of the Act under consideration assumes that the Secretary shall draw warrants in cases where money is not actually provided, in the strict sense of that word, and it directs that in such cases the Treasurer shall indorse the warrant, "not paid for want of funds."

What claims, then, are "in cases where provisions for the payment thereof shall have been made by law?" Provisions are made by law for paying a salary to District Attorneys, and no provision is made by law for paying a salary to a Sheriff. If money is placed in the general fund, or a salary fund, and a certain amount thereof is by an appropriation act appropriated to the payment of salaries of officers for the current year, the necessary money is provided; but when the money is provided and appropriated, if both a District Attorney and a Sheriff should present claims for salaries, it would still be the Secretary's duty, notwithstanding the appropriation, to ascertain whether provisions had been made by law for paying the respective claims. He would find one to be a case "where provisions for the payment thereof" had been made by law, a law having provided what party was entitled and the amount to be paid. In the other case, no such provisions would be found.

A fund may be created, money may be collected and kept

in the fund, and an appropriation may be made from the money; but still the question will remain in each case that comes before the Secretary of State, whether the claim is made *in a case* where provisions have been made by law for the payment thereof.   Collecting and appropriating money will not alone serve to bring any claim within the "cases where provisions for the payment thereof" have been made. Aside from, and in addition to, raising or providing money, some other provisions made by law must be found, or the Secretary has no right to allow the accounts; and I think it is obvious from the language employed, that the latter are the provisions referred to, and required by the statute in question.    It is a matter of grave doubt whether the Constitution would permit legislation such as it is claimed resulted from this section.

The Constitution provides that certain officers, the Governor, for instance, shall receive a specified salary annually; that "the Legislative Assembly shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year;" and that the Secretary of State "shall be, by virtue of his office, auditor of public accounts." Here are provisions made by the fundamental law for the payment, annually, to that particular officer, a specified sum.   To attempt to deprive the Secretary of State of the power to audit the claim, would seem much like an attempt to set aside the requirements of the Constitution.    It cannot be said that such a claim is not *in a case* where provision is made by law for its payment.

If it is contended that the Legislature, in enacting the section under consideration, relative to the Secretary's duties, used the language above quoted, not to interpose a barrier against allowing claims in cases where there was no law directing that the party should be paid, or specifying the services for which payment should be made, but sought to remedy the evil of a possible failure to make appropriations for the current expenses, by depriving the Secretary of State of the power to audit public accounts, it would seem to be doing evil that good may ensue, and to be violating the fundamental law in order to preserve

the State. This, it seems to me, would be assuming that one department of the government would or might violate the Constitution, and that the Legislature attempted to remedy the evil by compelling another department to violate it. When a definite and ascertained amount is due to a certain person, and the Constitution provides that the money shall be raised and the amount shall be paid within a specified time, I cannot conceive that it is a case where provisions for its payment are not made by law; nor can I conceive what power the Legislature has, under the Constitution, to prohibit the Secretary of State from auditing the account.

A statute must receive a construction consistent with its constitutionality, if its language will admit of such a construction. It seems to me clear that the construction contended for would conflict with the requirements of the Constitution, and I am fully convinced that it does not comport with the most obvious meaning, nor with the most reasonable construction of the language employed by the Legislature in defining the duties of the Secretary of State.

I am therefore compelled to dissent from so much of what I understand to be the opinion of a majority of the Court, as holds that the Secretary can audit public accounts only when there is an unexpended appropriation applicable to the payment of the particular claim presented. And I am of opinion that it is the duty of the Secretary of State to audit public accounts in every case where the law has clearly provided that the claimant shall be paid by the State; and if the claim is allowed, to draw his warrant for the amount due.

I think the warrants mentioned in the petition for mandamus were legally drawn, that the Legislature has passed no Act prohibiting the Treasurer from paying them, and that they are payable out of any money that may have been appropriated for the payment of the classes of expenses to which they respectively belong.